DAVID JATMAN, petitioner,

*v.*

ANNIE JATMAN, defendant.

[Decided December 16th, 1929.]

Mr. *Ralph Lum,* for the petitioner.

Messrs. *Fleming & Handford,* for the defendant.

BACKES, V. C.

The petition is for divorce for desertion. The marriage was the husband's third, the wife's first. His first wife died, his second divorced him, and he is weary of this one. He was well advanced in years, with a family of three grown children—she was thirty-nine. He had advertised for a wife, and they met and married in June, 1924. It was not a love match. She thought he was rich; he thought he wanted a wife. Both were disappointed. For reasons sufficient unto herself the wife deserted five times; the last in August, 1926. Shortly after the fourth, in October, 1925, the two conspired to be divorced in New York. He was "detected" in a hotel bedroom with a woman, and in her

petition she swore that the "adultery" was without her "consent, connivance, privity or procurement." He paid the lawyer. He also paid her something and promised more when divorced, and she left, with their infant, for her former home in Canada. The suit was later abandoned and she came back two or three months before she finally quit.

The defense pleads unclean hands. The doctrine is not invocable. This suit is for a cause in which the misconduct did not share. The uncleanness must relate to the cause in litigation. Here, the intervening *locus penitentia,* the resumed marriage relation, is preclusive. "The inequity which deprives a suitor of a right to justice in a court of equity is not general iniquitous conduct unconnected with the act of the defendant which the complaining party states as his ground or cause of action; but it must be evil practice or wrong conduct in the particular matter or transaction in respect to which judicial protection or redress is sought. *Neubeck* v. *Neubeck, 94 N. J. Eq. 167.* While the crime in New York does not bar the action, it reflects the moral obliquity of the two and their general incredibility.

Denying the desertion, the defendant answers that "she separated from the petitioner on the 25th day of August, 1926, at petitioner's suggestion and with petitioner's consent after he had been guilty of extreme cruelty against her and conduct amounting to matrimonial offense." If, by this, it was intended to plead an affirmative defense of extreme cruelty, it is insufficient for failure to charge the offense and for want of particularity of the acts of cruelty.

The volume of trifles and ill-treatment told by the defendant is unsupported by her witnesses, and is met by evidence quite as credible as hers, and more. Bitter retrospection, she calls it, "change in my character," has magnified her woes, and she related them without restraint of conscience. The petitioner's base character neutralizes his testimony to a degree, with the parity against him. The spiritual aspect of the oath meant nothing to either; it was court mechanics. The perjury and subornation of perjury in New York bears witness. The issue must, therefore, be solved largely upon

facts undisputed or extrinsically established as they tend to support one side or the other.

That the defendant deserted the matrimonial domicile on August 25th, 1926, and has been away for more than two years, is proved. The four prior desertions were willful and obstinate, unless her charge of extreme cruelty justified her going.

Two months after the marriage she left, to be gone from April 1st to the 14th. She again quit on May 1st, and returned December 1st. She left February 14th, 1925, and stayed away until the following June. She quit in October, 1925, to be gone until the following May, 1926. She deserted the last time in August of that year. All the desertions were against her husband's protest, and each time she returned at his solicitation. Once, she says, he persuaded her to postpone her departure. She says his protests were pretended and his solicitations unreal, in order to lay the foundation for a charge of desertion, and throughout her long narrative constantly harped on his insistence for a "get," a divorce, until, if true, it would appear to have been an obsession with him and a plague to her. He even tormented her in circumstances that would seem to repel the truth of her story; when their relations apparently were congenial; when he was seeking her to return, and immediately after he had succeeded; and at the hospital, just after the baby was born. If true, that at times he urged a divorce, it may have its explanation in a conditional desire to be free from a chronic deserter, *i. e.*, if she would not live with him he wanted his release; and this may have found expression in their effort to bring about the New York divorce. The defendant's testimony bears out that to have been the husband's attitude when he was coaxing her to come back after one of her desertions. And so does the deposition of Rabbi Levene, of Canada, whose intercession was sought by him, after the fourth desertion, to persuade his wife to divorce him or upon failure to try for a reconciliation. The fact that upon each of the five desertions he objected to her going and as many times sought her return would indicate that his general tendency was not

to be rid of her, but to have her. The New York incident gives some color to her story of his urging for a divorce, but no one is called to support it, except her mother, a "pinch" witness, who says that on one of the occasions when her son-in-law was seeking his wife's return, he expressed a wish for a divorce. If the desire was as notorious as the defendant would have it appear, the Coopermans, peace makers in their domestic troubles and reconciliations, now unfriendly to the petitioner, must have some knowledge, and they were not called; and so, the petitioner's brother, a mutual confidant of the two. The defendant's testimony of her husband's previous attitude was introduced to influence belief in her charge, that the last desertion, the one in issue, was by his consent and at his instance. It is no more trustworthy than her version of the last separation, and that does not commend itself. She had put an end to their conjugal relations a month before and had planned to leave and had shipped some of her things two weeks before. She admits her husband objected to her going but claims it was his usual gesture. She left a note: "Do not send any one after me to come back to live with you or do not try to persuade me to be with you any more. I shall never live with you again." She says she wrote it at her husband's dictation, and, in confirmation, points to the misspelling of persuade, which she claims to have inspirationally misspelled as he had mispronounced it, to have proof of his connivance in this anticipated suit. The note was written, she says, in Rabbi Levene's house, and that the Rabbi gave her a check for $300, which her husband had posted to be delivered upon her signing. Rabbi Levene, called by her, did not support her. She wrote another letter to her husband the same day, postmarked Newark, in which she says: "I will not live with you any longer. I have lost all affection for you. You must not write me or make any attempt to see me as I am all through with you." Of this she disclaims any recollection and offers no explanation. The last note carries not only the same sentiment as the first, but also a refutation that the former was dictated, and as well suggests that much of her testimony is fancy and fabrication.

She also contributes this; when her husband got her to return in May, 1926, he gave her a half interest in a house in Elizabeth, as part inducement. It was disposed of in July, and out of it she says she was to have $500 as the parting price, and that her husband, through one Krochmalnik, jewed her down to $300. Krochmalnik, called by her, denied any knowledge or connection with the matter. Whether this is the same $300 Rabbi Levene denied holding is not clear; nor is it above suspicion that the defendant has woven around her legitimate share of the sale of the house her story of being paid for deserting.

It is not doubted that the last desertion, like the previous four, was willful, nor that it was obstinate, against the will of the petitioner. What more could the petitioner do to detain her against her will to go or called upon to do to have her return? For some unaccountable reason she sent him a Jewish New Year greeting in September. He wrote asking that she return. She refused. He wrote again, with the same reply. He visited her in a hospital, Hamilton, Canada, in 1927; brought her flowers, candy and jewelry—she says, and cajoled her not to return because it would interrupt the continuity of her desertion. His later letters to her and hers to him stand in refutation. All her letters disclose her determination not to return because of his alleged ill-treatment. The futility of any further effort the petitioner might have pursued is obvious. When it appears that effort would be unavailing none need be made. *Hall* v. *Hall, 65 N. J. Eq. 709; Rogers* v. *Rogers, 81 N. J. Eq. 479.* Statutory desertion is established, unless the separation was justified on the ground of extreme cruelty.

It would be profitless to narrate the defendant's tale of ill-treatment; a summary will do. Underlying the defendant's discontent was the social and cultural misfit of the two—she was educated and of the finer texture. The manifest cause was dissatisfaction with her home surroundings and pecuniary disappointment; the latter, paramount. He was near and exacting in his allowance, which she resented, in the belief that he was wealthy and penurious. He allowed her $20 a

week, he says $25, for the table of five, and kept tabs on her expenditures; that irked her. She had no personal allowance and he bought her little, and that depressed her. His income was meagre; he dealt in oil cloths in a small way; his stock was kept in a room in the flat. Four years before the marriage he received a $25,000 legacy from his father's estate, which gave her the notion that he was well to do. He probably could have been more liberal, but he gave her more than she would admit. She had from him $200, at least, after she came back in May, 1926. She complains of his lack of social attention and of excessive sexual demands; of her drudgery in the household; of fault finding and cursing and hitting her, and of general ill-will of various forms of expression. The hitting, in bed, was not malicious, she says. Her witnesses, and there were many, all as one, failed to support her evidence, and one observed that she always addressed her husband as "dear." While it is the rule with ill-treated wives to keep secret their domestic affairs, the defendant had made a confidant of the petitioner's brother Abraham and of the Coopermans of their incompatability, and disagreements in money affairs, yet she never made mention to the brother of physical or mental illtreatment or called the Coopermans. The petitioner's children, who, she says, had an affection for her, denied her story of mistreatment, of hitting, cursing or harsh language. They say that they helped with the drudgery of the household; that the home was comfortable and well managed; that their father was considerate of his wife, and that the relations between him and her, and with them, were, on the whole, agreeable. Allowing for filial prejudice, their testimony is not without weight. An interlude in the harmony was, as she admits, slapping him in the face two or three times in August, 1926, and it is in evidence that she assaulted him with a knife and that she was not sparing in her curses. The defendant has not made out her case by clear and satisfactory proof. *Drayton v. Drayton, 54 N. J. Eq. 298.* Further, it is wholly without corroborative support. "When a defendant in a divorce case pleads a counter matrimonial offense against the petitioner

in bar of the suit, the offense so pleaded is not made out unless supported by corroborative evidence the same as though it were the basis of an application for divorce." *Rogers* v. *Rogers, supra.* The present case closely resembles that one in many of the essential features.

The petitioner is entitled to a divorce.